IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGELA O.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | )   No. 20 C 3949 |
| v. | ) |
| | )   Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[2] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[3]

Before the Court is Plaintiff Angela O.'s motion seeking remand of the Administrative Law Judge's ("ALJ") opinion denying her applications for benefits based on the claim that she has been disabled due to seizures since March 26, 2017, when she was 18 years old.[4] (D.E. 16.) The

---

[1] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On August 13, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 8.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

previous week, Plaintiff had experienced a generalized seizure in which she lost consciousness, fell backward and hit her head. (R. 419.) After being treated and released from the ER, Plaintiff followed up with neurologist Paul Grindstaff, M.D. on March 20, 2017; her neurological exam was normal, and she was prescribed Keppra and Lamictal to help control her seizures. (R. 419-20.) Plaintiff's EEG was normal (R. 429),[5] and a brain MRI showed no intracranial abnormality. (R. 432.) On April 12, Plaintiff returned to Dr. Grindstaff; her mother reported that Plaintiff had a generalized tonic-clonic seizure the prior week,[6] after she had stopped taking Keppra. (R. 425.) Plaintiff had also stopped taking Lamictal because it made her forehead itch. (*Id*.) Dr. Grindstaff directed her to take both Lamictal and Keppra. (*Id*.)

On May 22, 2017, Plaintiff had an initial visit with neurologist Elizabeth E. Gerard, M.D. Plaintiff reported that she had a seizure on May 11; she had restarted Lamictal but was weaning off Keppra at the time. (R. 638-39.) Dr. Gerard ordered additional testing and directed Plaintiff to continue taking Keppra and Lamictal. (R. 642-45.) On June 15, Plaintiff's mother reported that Plaintiff had a "mini seizure" on June 8 after missing her medication. (R. 665.) In July, Plaintiff underwent five days of EEG monitoring in hospital; she had no significant seizure activity while taking Keppra and Lamictal, but without medication, two generalized seizures were observed. (R. 447.) The neurologist concluded that Plaintiff's medication regimen was effective. (R. 448.)

On July 24, 2017, Plaintiff underwent a neuropsychological evaluation which showed she had verbal intellectual abilities in the low average range and nonverbal intellectual abilities in the borderline range. (R. 676.) Plaintiff was diagnosed with mild neurocognitive disorder and a

---

[5] An electroencephalogram (EEG) is a test that measures electrical activity in the brain.

[6] A tonic-clonic seizure may involve a sudden loss of consciousness, body stiffening and shaking. https://www.mayoclinic.org/diseases-conditions/seizure/symptoms-causes/syc-20365711.

learning disorder in math and writing. (*Id*.) The report recommended academic accommodations including extended time on tests and a device to assist with taking notes. (R. 677.)

On August 8, 2017, Plaintiff's mother told Dr. Gerard that on the car ride that day and on July 18, she could tell Plaintiff was about to have a seizure because Plaintiff's stomach and back hurt and her hand jerked (R. 803); Plaintiff's mother gave her Klonopin both times, a "rescue" drug that stopped Plaintiff from having a seizure. (R. 806.) In addition to Keppra, Lamictal and Klonopin, Dr. Gerard prescribed the anti-seizure drug Onfi and recommended Plaintiff use polarized sunglasses to mitigate her photosensitivity during car rides. (*Id*.) On August 14, Dr. Gerard wrote a letter stating that Plaintiff should be given accommodations for her seizure disorder, which Dr. Gerard wrote could cause periods of fatigue, weakness, confusion and memory deficits lasting from a few minutes to a few days after a seizure. (R. 825-826.) In September and October, Plaintiff's mother reported that Plaintiff was doing well with her medications; she had not had any seizure activity despite multiple car rides. (R. 845-846, 863.)

On October 30, 2017, Plaintiff and her mother filled out function reports. Plaintiff wrote that she could not drive or leave the house alone due to her seizures, but that they had no effect on her activities, which included taking care of her dogs, doing chores, going shopping, going to the gym, and hanging out with friends. (R. 223- 28.) Plaintiff occasionally needed reminders to take her medicine, but she followed written and spoken instructions well. (R. 225, 228.) Plaintiff's mother wrote that Plaintiff "usually" finished what she started but did not always listen well. (R. 245.) Plaintiff's mother also filled out a seizure questionnaire, writing that she had witnessed four seizures involving full body thrashing and loss of consciousness. (R. 236.) Plaintiff's boyfriend wrote that he had witnessed three seizures, during which Plaintiff jerked and lost consciousness for a couple seconds. (R. 237.)

3

On April 3, 2018, Plaintiff's mother filled out another seizure questionnaire, stating that she had witnessed 18 seizures since April 2017, involving shaking followed by loss of consciousness for a few minutes. (R. 271.) On April 6, Plaintiff's father and boyfriend filled out questionnaires indicating they had also observed Plaintiff's seizures. (R. 272-73.) Plaintiff filled out a function report on April 6, which was largely the same as her previous report. (R. 261, 268.)

Plaintiff underwent genetic testing, which revealed an abnormality "of uncertain clinical significance," which might or might not be related to her seizures and learning disability. (R. 1002, 1182-83.) In June 2018, Plaintiff reported having seizures once a month when she was in the car and on her period, usually involving jerking activity on one side of her body; Plaintiff was sometimes able to abort the seizure with Klonopin, and she had not had a seizure the previous month "possibly due to initiating iron." (R. 1046-47.) Dr. Gerard opined that these were myoclonic-absence seizures,[7] which together with Plaintiff's "mild intellectual disability," was consistent with a diagnosis of idiopathic (of unknown origin) generalized epilepsy, which was "not intractable." (R. 1046, 1049-50.) Plaintiff reported taking Onfi, Keppra and Lamictal with no side effects, and Dr. Gerard again recommended Plaintiff obtain polarized sunglasses. (*Id.*)

On October 11, 2018, Dr. Gerard filled out a residual functional capacity ("RFC") questionnaire. She indicated that she had seen Plaintiff for "1.5 years; twice per year" for Plaintiff's myoclonic, absence and tonic-clonic seizures, which were "well controlled" with a medication regimen of Keppra, Onfi and Lamictal; Plaintiff's last seizure was in December 2017. (R. 1150-51.) Dr. Gerard noted that lethargy was a side effect of the medications. (R. 1152.) Dr. Gerard opined that Plaintiff's seizures were likely to disrupt co-workers, and she would need additional

---

[7] Myoclonic seizures "appear as sudden brief jerks or twitches of the arms and legs," and absence seizures "typically cause a person to stare into space or make subtle body movements" for a few seconds. https://www.mayoclinic.org/diseases-conditions/seizure/symptoms-causes/syc-20365711.

supervision at work. (R. 1152.) In addition, Plaintiff could not work at heights, with power machines, operate a motor vehicle, or take the bus alone, and Dr. Gerard checked boxes indicating that Plaintiff had limitations in each of the Paragraph B areas that would "preclude[] performance" for 20 percent or more of an eight-hour workday. (R. 1152-54.) Dr. Gerard further opined that Plaintiff would need to take unscheduled one-hour long breaks one to two times each workday and would be absent from work about three days per month due to her seizure impairment. (R. 1154.)

## II.     April 18, 2019 Hearing

Plaintiff testified that she graduated high school and had been taking one online college course per semester since fall 2018. (R. 43-44.) She testified that her medications helped control her seizures without side effects; she had not had a seizure since March 2018 because she took her "emergency" medication when she started to feel shaky. (R. 45-47.). Plaintiff said she did chores including laundry, vacuuming, dusting and feeding the dog, and she had no difficulty taking care of herself. (R. 47-48.) Plaintiff liked to spend time with friends and her boyfriend at home or at the mall, although sometimes she was nervous going places. (R. 47, 49.) Her mother testified that Plaintiff was "pretty good about remembering" to take her medications, and that Plaintiff still got absence seizures, but it was difficult to tell if she was having them. (R. 54-55, 57-58.)

The medical expert, Gilberto Munoz, M.D., testified that Plaintiff's seizures did not meet Listing 11.02 and that she would be able to perform light work with certain safety limitations. (R. 61.) He found no support for Dr. Gerard's opinion that Plaintiff would be off-task for hours each day because the record showed that she had no seizures when she took her medications. (R. 65-66, 71.) Next, the vocational expert ("VE") testified that a significant number of jobs were available to an individual limited to light work with no driving, unprotected heights, heavy moving

5

machinery, ladders, ropes or scaffolds, and who could understand, remember and carry out simple routine tasks and make simple work-related decisions. (R. 74-75.)

### III.     July 2, 2019 ALJ Opinion

The ALJ determined that Plaintiff had the severe impairments of seizure disorder, neurocognitive disorder and learning disorder. (R. 18.) The ALJ agreed with Dr. Munoz that Plaintiff did not meet Listing 11.02, which required her to demonstrate that "despite adherence to prescribed treatment," she had at least one generalized tonic-clonic seizure per month for three consecutive months; *or* one dyscognitive seizure per week for three consecutive months; *or* one generalized tonic-clonic seizure every two months for four consecutive months *and* a marked limitation in physical function; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; *or* adapting or managing oneself (the paragraph B criteria); *or* one dyscognitive seizure every two weeks for three consecutive months *and* a marked limitation as described above. (R. 18-19.) The ALJ explained that the evidence showed Plaintiff was not adhering to prescribed treatment on the three occasions she had tonic-clonic seizures: (1) March 2017 was "before any sort of anti-convulsive medication regimen had been started;" (2) April 2017 was "related to medication noncompliance, as [Plaintiff] had stopped taking her Keppra and [Lamictal];" and (3) May 2017 was while Plaintiff was on Lamictal "but was being weaned off Keppra." (R. 19.) The ALJ also determined that Plaintiff's subsequent seizure activity "was limited to hand shaking/stiffening," except for one instance of "whole body shaking in July 2017, while taking Lamictal and Keppra." (*Id*.) Moreover, the ALJ noted that any abnormalities during Plaintiff's EEG monitoring occurred when her medicine had been withheld, leading the neurologist to conclude that her medication regimen effectively controlled her seizures. (*Id*.) Furthermore, Plaintiff testified that she had not had a seizure for more than a year before her

6

hearing, and in June 2018, she described her seizures as limited to involuntary tremors. (*Id*.) Thus, the ALJ determined seizures did not markedly impair Plaintiff's physical functioning. (*Id*.)

The ALJ also determined that Plaintiff did not have a marked impairment in any of the "paragraph B" areas. (R. 19.) The ALJ found Plaintiff had mild limitation in understanding, remembering, or applying information, interacting with others, and adapting or managing oneself because she took college-level courses online, took care of pets, and performed household chores. (R. 20-21.) In addition, Plaintiff indicated in her function report that she had no difficulty paying attention or following instructions and did not need reminders to take care of grooming or take medication, although her mother occasionally checked to make sure she took her medication. (*Id.*) Plaintiff also indicated that she had no trouble getting along with others, and she often went out or spent time with friends and family, including going shopping. (*Id.*) With regard to concentrating, persisting, or maintaining pace, the ALJ found Plaintiff had moderate limitation because she had been identified with borderline intellectual functioning and a learning disability; nevertheless, she had no difficulty paying attention or following instructions, and she had completed her function report legibly, completely and appropriately. (R. 21.) The ALJ further noted that Plaintiff did not receive any mental health treatment during the period under consideration. (*Id*.)

The ALJ assigned Plaintiff an RFC to perform light work that avoided unprotected heights, heavy moving machinery, driving, and climbing ladders, ropes or scaffolds, and that was limited to simple, routine tasks and simple work-related decisions (R. 21-22); the ALJ adopted the VE's opinion as to the jobs available. (R. 31.) The ALJ explained that more limitations were not warranted because in addition to the evidence listed above, imaging after Plaintiff's seizure in March 2017 showed only a bruise, not a traumatic head injury, and despite reporting seizure activity on the way to her appointment with Dr. Gerard in August 2017, Plaintiff's physical and

mental examinations were normal and unchanged from prior visits. (R. 24, 26.) In addition, in 2018, Dr. Gerard described any remaining seizures as myoclonic-absence seizures. (R. 27.) As to Plaintiff's mental limitations, the ALJ acknowledged Plaintiff had mild neurocognitive disorder and a learning disorder but did not find the recommended accommodations for classroom learning and testing to be persuasive with regard to Plaintiff's work-related abilities. (R. 26.)

The ALJ also did not find Dr. Gerard's opinion to be persuasive. The ALJ found that Dr. Gerard's letter indicating that Plaintiff's post-seizure limitations could last several days was not supported by the evidence. (R. 26.) In addition, the ALJ determined that Dr. Gerard's October 2018 RFC opinion was not consistent with Plaintiff's testimony that she had no seizures since March 2018, and that there was "no support in any of [Dr. Gerard's] treatment notes" for his opinion that Plaintiff would need long rest breaks and would be off task a significant percentage of the workday, or that she would miss several days of work a month, "particularly in light of [Dr. Gerard's] observation that [Plaintiff's] seizure disorder was now well controlled with medication." (R. 27-28.) The ALJ did, however, accept Dr. Gerard's opinion "with regard to reasonable safety concerns and avoidance of potential hazards secondary to unpredictable seizure events," which limitations Dr. Gerard had also endorsed in June and August 2017. (R. 26, 28.) By contrast, the ALJ found Dr. Munoz's opinion was generally consistent with the evidence, which showed that Plaintiff's seizures were controlled during periods of medication compliance. (R. 28-29.) In addition, the ALJ reasoned that Dr. Munoz had medical and Social Security expertise, and he had access to the entire record and the opportunity to observe Plaintiff, so his opinion was "based on a greater longitudinal perspective of the claimant's condition." (*Id.*)[8]

---

[8] The ALJ also was not persuaded by Plaintiff's mother's statement that Plaintiff was "uncertain" when she left the house without her mother, because Plaintiff indicated that she often went out with her friends and boyfriend. (R. 29.) The ALJ also did not find persuasive the seizure questionnaires submitted by Plaintiff's parents and boyfriend, because "the accuracy of their statements [was] questionable," since "[t]hey d[id]

8

IV.     **Analysis**

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted).

    **A.**     **The ALJ's Determinations As To Plaintiff's Seizure Disorder Was Supported By Substantial Evidence.**

The physical limitations in the RFC were supported by substantial evidence. Each of Plaintiff's arguments to the contrary amounts to an attempt to convince the Court to reweigh the evidence, which the Court will not do. First, Plaintiff argues that she had been compliant with treatment when she had tonic-clonic seizures in March, April and May 2017. (D.E. 16: Pl.'s Mot. at 10-11.) However, the ALJ more than adequately explained how the evidence showed the contrary, that Plaintiff had not been compliant with treatment. Second, Plaintiff argues that the ALJ's assessment of her seizure activity and EEG monitoring in 2017 was "premised upon an erroneous iteration of the facts." (*Id*. at 11.) But the ALJ's "iteration" was linked clearly to the neurologists' conclusions that Plaintiff's seizures were controlled with medication and was thus supported by substantial evidence. Third, Plaintiff argues that the ALJ "ignored" evidence that she suffered a "traumatic brain injury" in March 2017 (*id*. at 11-12), but the ALJ addressed this

---

not differentiate between the nature and type of purported seizure activity, the duration and postictal symptoms of individual events, or those events that occurred when the claimant was not receiving or adhering to prescribed treatment." (R. 29-30.)

9

contention directly, and based her conclusion that imaging showed only a bruise on substantial evidence: the evaluating doctor's assessment.

      **B.    The ALJ's Determination As To Plaintiff's Mental Impairments Was Supported By Substantial Evidence.**

With regard to the mental limitations in her RFC, Plaintiff argues that the ALJ failed to adequately address her "long history of extremely low cognitive and intellectual functioning" which required "extreme accommodation in school setting," and failed to fully accommodate her limitations in concentration, persistence or pace. (Pl.'s Br. at 12-14.) However, the ALJ did address the evidence of Plaintiff's intellectual and cognitive functioning and linked the limitations in the RFC to that evidence. By contrast, Plaintiff offers no evidence in support of her claim that "mere limitation to simple routine tasks involving simple work-related decisions falls far short;" the fact of Plaintiff's school accommodations does not somehow translate to a finding of disability or more extensive limitations. (*Id*. at 13.) Indeed, Plaintiff "has not pointed to any medical opinion or evidence to show any [mental impairments] caused any specific limitations." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021). The ALJ found that Plaintiff's concentration, persistence, or pace was moderately impaired, "but [Plaintiff] cites no evidence that those deficits keep [her] from performing simple [and] routine . . . tasks," and "the medical record does not support any." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Thus, the ALJ's decision was supported by substantial evidence.

      **C.    The ALJ's Assessment of Dr. Gerard's Opinion Was Supported By Substantial Evidence.**

Next, Plaintiff argues that in considering Dr. Gerard's opinion, the ALJ "ignor[ed] regulatory factors" and the deference entitled to Dr. Gerard in light of her specialty and treating relationship with Plaintiff. (Pl.'s Mot. at 14-15.) However, Dr. Gerard's opinion is not entitled to

deference. For claims filed after March 27, 2017, such as this one, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). "The most important factors" to consider in evaluating the persuasiveness of a medical source's opinion are "supportability" (in the medical source's explanations and medical evidence) and "consistency" (with the evidence from other medical and nonmedical sources in the record), and ALJs must explain how they considered these factors. *Id*. at § 404.1520c(b)(2) and (c). ALJs "may, but [are] not required to" how they considered a medical source's specialization or relationship with a claimant. *Id*.

Here, the ALJ provided detailed evidentiary support for the determination that Dr. Gerard's opinion as to Plaintiff's off-task time and absenteeism was neither supported in Dr. Gerard's own treatment notes nor consistent with other evidence in the record, including Plaintiff's testimony and function reports. In fact, as the ALJ pointed out, Dr. Gerard herself opined that Plaintiff's seizure disorder was well controlled with medication. Contrary to Plaintiff's argument, it was not "odd[]" for the ALJ to accept the "safety limitations" in Dr. Gerard's opinion or to build precautions into the RFC in case of unexpected seizure activity. (Pl.'s Mot. at 15-16.) As the ALJ explained, those limitations were consistent with Dr. Gerard's treatment notes and other evidence in the record, which never concluded that there was zero possibility of an episode while Plaintiff was taking medication.

The ALJ also supported her decision to rely on Dr. Munoz's testimony with substantial evidence. Contrary to Plaintiff's contention that the ALJ had "no explicit or conceivable justification" to accept the medical expert's testimony or that Dr. Munoz "was not fully informed" (*id*. at 14-15), the ALJ explained how Dr. Munoz's opinion was consistent with the evidence,

11

which showed that Plaintiff's seizures were controlled during periods of medication compliance. (R. 28-29.) Moreover, the ALJ accurately pointed out that unlike Dr. Gerard, who admittedly saw Plaintiff only twice per year for 1.5 years, Dr. Munoz reviewed the entire record before offering his opinion, and his opinion was thus "based on a greater longitudinal perspective of [Plaintiff's] condition." (*Id*.) Thus, the ALJ's opinion was supported by substantial evidence. Plaintiff in effect wants the Court to reweigh the opinions of Dr. Gerard and Dr. Munoz and weigh them differently than did the ALJ. But this we will not do and cannot do on appeal of the ALJ's decision. *See Reynolds*, 25 F.4th at 473.

## CONCLUSION

For these reasons, the Court denies Plaintiff's motion to remand. (D.E. 16.)

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: February 27, 2023**